UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY TITLE INSURANCE COMPANY,<br><br>*Plaintiff,*<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, and BROWN & BROWN OF CONNECTICUT, INC. d/b/a DILL, JOYCE & THRESHER INSURANCE,<br><br>*Defendants.* | Civil Action No. 2:11-civ-630-DMC-JAD |

**LEGAL MEMORANDUM SUBMITTED BY PLAINTIFF NEW JERSEY TITLE INSURANCE COMPANY IN OPPOSITION TO DEFENDANT NATIONAL UNION INSURANCE COMPANY OF PITTSBURGH'S MOTION TO DISMISS THE COMPLAINT PURSUANT TO RULE 12(B)(6)**

PODVEY, MEANOR, CATENACCI, HILDNER,
COCOZIELLO & CHATTMAN, P.C.
The Legal Center
One Riverfront Plaza, 8th Floor
Newark, New Jersey 07102
(973) 623-1000
Attorneys for Plaintiff, New Jersey Title
Insurance Company

Henry J. Catenacci, Esq.
    Of Counsel

Lisa J. Trembly, Esq.
Lainie Miller, Esq.
    On the brief

## PRELIMINARY STATEMENT

The pending motion filed by Defendant National Union Fire Insurance Company of Pittsburgh ("National Union" or "Defendant") is frivolous and utterly without merit.

This litigation involves, *inter alia*, a breach of an insurance contract and bad faith by National Union. As alleged in the complaint, Plaintiff New Jersey Title Insurance Company ("NJ Title") authorizes agents to settle and close title for real estate closings. NJ Title specifically obtained insurance, through its broker, from National Union to provide coverage in the event one of its agents misappropriated funds entrusted to the agent. A NJ Title agent, who was explicitly identified as an agent under the policy at issue, misappropriated closing funds which caused NJ Title to suffer substantial losses. National Union, without basis in law or fact, wrongfully denied coverage for the misappropriation despite the fact that coverage is clear and unambiguous and that National Union paid an identical claim under a prior policy.

NJ Title properly filed a complaint alleging coverage under the policy, which is all that an insured must prove. National Union has now made a meritless motion to dismiss under Rule 12(b)(6), asserting unsupported policy interpretations and relying on a purported exclusion in the policy. The interpretation of the insurance policy is a matter for the Court to decide upon an adequate record, not upon a lawyer's argument as to what the policy, means and, clearly, there is no requirement that an insured plead that its claim does not fall within a policy exclusion which the insurer has the burden of establishing.

This memorandum is submitted in opposition to defendant's motion.

## **STATEMENT OF FACTS**

NJ Title seeks coverage under Bond No. 02-283-42-48 issued by National Union for its loss associated with the misappropriation of funds by its former agent, Landserv Title Agency, LLC ("Landserv").

NJ Title engages agents to, among other things, settle and close title for real estate closings. At closing, an agent receives funds in its trust account from lenders and/or purchasers. At or immediately after settlement, the agent disburses the trust funds to pay off prior mortgages, taxes, water bills and other municipal charges. (*See, e.g.*, Declaration of Henry J. Catenacci, Ex. C, hereinafter "Catenacci Dec.").

Pursuant to an agency agreement between NJ Title and Landserv dated May 22, 2008, Landserv agreed to act as an agent of NJ Title "to close title (hold settlement)." (*Id.* at ¶1, at p. 1).

> Significantly, pursuant to the agency agreement, Landserv was obligated to:
>
> > [k]eep safely and separated in a bank trust account all money entrusted to Agent by Insurer or others in the course of Agent's operation under this agreement, and **keep safely any property entrusted to Agent.** ...

(*Id.* at Sect. 2. F.) (emphasis supplied).

NJ Title alleges that an employee of Landserv, Yvette A. Nelson-Quinones ("Quinones"), in the course of her employment in closing title, misappropriated funds which NJ Title was required to reimburse. (*See* Complaint ¶¶21, 29-33).

The sole purpose of obtaining the insurance policy at issue was to provide coverage for an agent's infidelity, the precise circumstances here. (*Id.* at ¶9).

2

NJ Title paid National Union a premium for National Union's issuance of fidelity bond No. 02-283-42-48. In relevant part, Rider No. 6 to the bond, entitled "Agents Fidelity Rider" provides as follows:

It is agreed that:

1. The **INSURING AGREEMENTS** Clause of the attached bond is amended by adding the following additional Insuring Agreement to the end thereof:

   AGENTS FIDELITY

   Loss resulting directly from dishonest or fraudulent acts committed by an Agent named or described below acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Agent with the manifest intent:

   a) to cause the Insured to sustain such loss; and
   b) to obtain a financial benefit for the Agent.

(See Ex. 3 to Declaration of Richard S. Mills dated April 25, 2011, hereinafter "Mills Dec."). Pursuant to the Rider, the term "agent" includes employees of the Agent. (*Id.*)

Also, pursuant to the Rider, coverage is extended to include all agents identified by NJ Title. (*Id.*)

Landserv was clearly identified as an agent of NJ Title pursuant to an agents list provided to the Defendant in June 2009. (*See id.* and Catenacci Dec. at Ex. A, at p. 9).

In fact, on a prior occasion, under a nearly identical bond issued by National Union, National Union paid NJ Title's claims for the misappropriation of closing funds by its agents. (*See* Complaint at ¶40 and Exs. B, D-F).

Further, contrary to the unsupported factual argument made by National Union, the policy was not purchased only to obtain coverage for misappropriated premiums. In fact, any such coverage would be illusory. The policy at issue contains a $50,000 deductible. NJ Title receives an average remittance of premium of $201.02 per file. It would take between 2 and 7

years for a typical agent such as Landserv's total remittances in premiums to ever reach the deductible amount and the bond at issue only covers a one-year period. Further NJ Title prioritizes agents to be audited if an agent has not remitted premiums for 3 months.

NJ Title would not need, nor would it be willing to pay for, insurance that insured nothing. As such, any coverage for the theft of premiums only, as asserted by National Union, would be illusory.

For all the foregoing reasons, National Union's motion to dismiss should be denied with prejudice.

## LEGAL ARGUMENT

### POINT I

#### PLAINTIFF'S COMPLAINT STATES A CLAIM DUE TO DEFENDANT'S FAILURE TO HONOR ITS INSURANCE POLICY

The Supreme Court delineated the standard for deciding a motion to dismiss under Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). There, the Court stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions. ..." *Id.* at 555

The Third Circuit has ruled that *Twombly* did not substantially change the standard for notice pleading, and declined to adopt or apply a "heightened pleading standard." *Phillips v. Cty of Allegheny*, 515 F.3d 224, 234 (3rd Cir. 2008). Rather, *Twombly* "reaffirmed that Fed. R. Civ. P. 8 'requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests' and that "this standard does not require detailed factual allegations." *Id.* at 231 (*citing Twombly*, 127 S.Ct. at 1964). The Third Circuit summarized the *Twombly* standard:

> stating a claim requires a [claim] with enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.

*Id.* at 234 (*citations omitted*).

Further, a motion to dismiss for failure to state a claim does not attack the merits of the case, but merely tests the legal sufficiency of the complaint. *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987). When deciding a 12(b)(b) motion to dismiss, the court construes the complaint liberally and accepts as true all allegations in the complaint viewing them in the light

most favorable to the plaintiff. *University of Md. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1537-38 (3d Cir.1993).

Moreover, this Court may consider the Declaration of Henry J. Catenacci and its attachments filed herewith because they are integral to or explicitly relied upon in the pleadings. *See, Hart v. Electronic Arts, Inc.*, 740 F.Supp.2d 658, 662-63 (D.N.J. 2010)

NJ Title clearly alleges that National Union issued several policies to NJ Title, including Bond No. 02-283-42-48, which specifically provides insurance coverage for the dishonest or fraudulent acts of NJ Title's agent. (*See* Complaint at ¶¶13-16). NJ Title alleges that it paid National Union substantial premiums for the Bond and that NJ Title sustained losses as a result of its agent's misappropriation of funds. (*Id.* at ¶¶17, 20-21). The Complaint specifically alleges that NJ Title filed a timely claim with National Union and that National Union improperly denied the coverage. (*Id.* at ¶¶22-23). NJ Title states a viable claim against National Union for its breach of contract. NJ Title is not required to demonstrate the breach of contract in its Complaint. Rather, the law merely requires that the Complaint place National Union on notice of the claims against it. Clearly, NJ Title's Complaint does just that.

Additionally, as delineated in more detail below, and considering the allegations of the complaint and the documents integral to it and/or expressly reference in it, NJ Title has a viable bad faith claim.

## POINT II

### PLAINTIFF'S COMPLAINT STATES A VIABLE BAD FAITH CLAIM SINCE COVERAGE IS NOT FAIRLY DEBATABLE

*Pickett v. Lloyds,* 131. N.J. 457, (1993) is the leading New Jersey Supreme Court case that sets forth the common law requirements for establishing a bad faith claim. In *Pickett*, the insured, a truck driver, whose tractor-trailer truck suffered irreparable damage from a highway

collision, alleged that the carrier acted in bad faith in handling his claim, and was thereby seeking damages in excess of the operating policy's benefits, which only covered the value of the truck. *Id.* at 461-62. At trial, a jury found the carrier's agent directly responsible to plaintiff for a lack of good faith and fair dealing. *Id.* at 464.

In affirming the verdict and rulings of its lower courts, the Supreme Court added that there is a sufficient basis in law for such a recovery because in every contract there exists an implied duty of good faith and fair dealing on each party in the contract's performance and its enforcement. *Pickett*, 131 N.J. at 467 (citing *Onderdonk v. Presbyterian Homes*, 85 N.J. 171, 182 (1981); *Bak-A-Lum Corp. v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 129-30 (1976); *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)). In fact, an insurer's obligation rises to the level of a fiduciary duty. *Id.* (citing *Rova Farms Resort, Inc. v. Investors Insurance Co.*, 65 N.J. 474, 491 (1974) ("the relationship of the company to its insured regarding settlement is one of inherent fiduciary obligation"); *Sobotor v. Prudential Property & Casualty Ins. Co.*, 200 N.J. Super. 333, 337-41 (App. Div. 1984) (finding that relationship of insured and insurer, either agent or broker, is fiduciary one, carrying with it affirmative duties toward the insured); *Sandler v. Lawn-A-Mat Chem. & Equip. Corp.*, 141 N.J. Super. 437, 450-51 (App. Div. 1976) (stating that insurer owes insured special duty of good faith and fair dealing)).

The Court in Pickett found that to support a claim of bad faith, the insured must establish that no fairly debatable reasons existed for denial of the benefits. 131 N.J. at 472.

As acknowledged by Defendant, most of the case law in the district court dismissing bad faith claims does so in the context of motions for summary judgment, after the close of discovery. (*See* Defendant's brief at p. 21). At the early stages of litigation prior to any discovery, it is improper to dismiss a bad faith claim where a plaintiff alleges specific factual allegations from which a court could infer that National Union's coverage denial was

7

unreasonable and in bad faith. Defendant simply ignores NJ Title's allegation that "National Union has previously paid similar claims filed by NJ Title under Bonds issued by it, with identical coverage and language." (*See* Complaint at ¶ 40).

Based upon National Union's prior adjustment and payment of an identical claim resulting from losses due to the theft of an agent under a nearly identical Bonds, National Union's current position that there is no coverage is unreasonable and not fairly debatable. (*See id.* and Exhibits B & D-F to Catenacci Dec.).

Further, the sole purpose of obtaining the insurance policy was to cover an agent's dishonesty and theft. (*See Complaint*, at ¶9). Clearly, the policy provided coverage and in the least NJ Title had a reasonable expectation that the misappropriation of funds by Landserv would be covered under the National Union bond at issue, just as the previous claims resulting from agents' misappropriation. As such, NJ Title does state a viable bad faith claim.

## POINT III

### NJ TITLE'S CLAIM IS COVERED UNDER THE BOND ISSUED BY NATIONAL UNION

Defendant first attempts to argue that NJ Title's Complaint does not state any viable causes of action as a procedural matter under Rule 12(b)(6) which has no merit as pointed out in Point I of this memorandum. Thereafter, Defendant improperly argues on a motion to dismiss the substantive merits of coverage under the Bond at issue. Plaintiff feels compelled to respond thereto.

As a matter of fact and law, totally contrary to National Union's position, the terms of the bond are clear and unambiguous and provide coverage for the current loss. The ownership clause and exclusion (f) (iii) do not preclude coverage. Rather, the policy clearly provides coverage for the theft by an insured's agent, including Landserv which was directly and

explicitly identified as an agent under the policy. (*See* Ex. 3 to Mills Dec. and Ex. A to Catenacci Dec.).

Defendant's argument on page 25 of its brief that NJ Title has not stated a claim because it has not alleged that Landserv was an agent provided in the binder is entirely misplaced. NJ Title has alleged that Landserv was an agent covered under the policy. (*See, e.g.*, Complaint ¶¶ 14-19, 29-30). Additionally, as Exhibit A, page 9, to Catenacci's Declaration demonstrates Landserv was identified as an agent of NJ Title insured under the bond.

Further, to the extent that any of the policy terms are ambiguous, all ambiguities must be construed in favor of coverage. Additionally, the law is well-established that courts may consider extrinsic evidence to find an ambiguity in a contract. *See e.g., In re New Valley Corp.*, 89 F.3d 143, 150 (3d Cir. 1996) (noting that before making a determination as to the existence of an ambiguity, the court will consider the contract language, the meanings suggested by counsel and the extrinsic evidence offered in support of the parties' interpretations); *Frank Briscoe Co., Inc. v. Travelers Indem. Co.*, 899 F. Supp. 1304, 1308 (D. N.J. 1995) (quoting *American Cyanamid v. Fermenta*, 54 F.3d 177, 181 (3d Cir. 1995) (stating that "[t]o decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, 'we hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'"); *National Utility Service, Inc. v. Chesapeake Corp.*, 45 F. Supp.2d 438, 446 (D.N.J. 1999) (acknowledging that extrinsic evidence may reveal an ambiguity that was not apparent from the face of the contract).

Here, the court must consider extrinsic evidence, which includes the intentions of the parties. Thus, the reasonable intentions of NJ Title must be considered. The sole purpose and intent of obtaining the fidelity bond at issue and the submission and payment by Defendant of a

9

prior identical claim under a nearly identical bond demonstrate that NJ Title had a patent and reasonable expectation for coverage of its current claim.

A.      **The Ownership Clause.**

Section 10 of the bond, the ownership provision, provides that the bond applies to "loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable." Landserv's role was to act as settlement agent at the closing. It was required by the agency agreement to "keep safely any property entrusted to" it. When Landserv misappropriated the funds at the closing, NJ Title was required by law to replace that property. Further, even if the misappropriated funds were not "owned" by the insured, it is undisputed that NJ Title "is legally liable" for the misappropriated funds

National Union argues that New Jersey Title did not "hold" the funds misappropriated by the Landserv's employee and therefore is not entitled to coverage under the Policy. National Union, however, fails to cite a single case where a court applying the same contract language denied coverage under circumstances similar to those presented here. Instead, National Union relies on *John M. Forrest and Assocs., Inc. v. Western Fire Ins. Co.*, 1986 WL 8636 (Ohio App. 9 Dist.), a case where the court found there *was coverage* under the fidelity bond for funds stolen by the insured's agent. As explained below, National Union's entire argument, including its reliance on *Forrest*, misses the mark because it fails to acknowledge the broad scope of coverage purchased by NJ Title. The Bond not only applies to property "held" by the Insured, but also applies to property "held by the Insured *in any capacity*." The relevant case law interpreting this type of contract language makes clear that New Jersey Title held the funds that were misappropriated by its agent, Landserv.

In *Elmer Fox & Co. v. Commercial Union Ins. Co. of N.Y.*, 274 F. Supp. 235 (D. Colo. 1967), an accounting firm sought reimbursement under its insurance policy after its employee

10

misappropriated approximately $131,200 from several jewelry companies. The accounting firm had contracted with these jewelry companies "to do their bookkeeping, to prepare financial reports, to handle the transfer of funds among bank checking accounts maintained by them and to do other related work." *Id.* at 236-37. The employee had set up fictitious bank accounts in the names of several of these jewelry store clients, and then deposited monies belonging to the clients into these fictitious accounts without the knowledge of the clients or his employer. *Id.*

"Insuring Agreement I provides in its essential parts to pay the plaintiff for:"

> A loss of Money, Securities and other property which the Insured shall sustain in an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this Insuring Agreement I through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.

*Id.* at 238-39. The policy also contained the following Conditions and Limitations provision:

> The insured property may be owned by the Insured, or *held by the Insured in any capacity* whether or not the Insured is liable for the loss thereof, or may be property as respects which the Insured is legally liable

*Id.* at 239. In finding for the Insured, the court concluded that "the money dishonestly obtained by the employee from the bank accounts involved was money which was held by [the accounting firm] within the meaning of Insuring Agreement I." *Id.*

Similarly, here the funds misappropriated by Ms. Quinones are covered under the bond. The fact that Ms. Quinones was not an employee of NJ Title is inconsequential because, pursuant to Rider No. 6, the bond specifically is extended to include the dishonest acts of NJ Title's agents. Thus, as the court reasoned in *Elmer Fox*, the unlawful taking of funds from a client falls within the broad scope of funds "held by the Insured *in any capacity*."

Further, National Union's attempt to distinguish *Forrest*, 1986 WL 8636, is misplaced. In *Forrest*, two employees embezzled funds in excess of $66,000 worth of premiums held for its

11

principal. *Id.* at *1. After the insured reimbursed the principal for the loss, it submitted a claim to Western Fire. *Id.* In denying the claim, Western Fire argued that the insured suffered no compensable loss under the policy. *Id.*

The court, however, found that the policy provided coverage as the policy covered "property. . .owned by the Insured, or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof. . ." *Id.* at *2. Based upon this provision, the Court found:

> the terms of [the] policy unambiguously provide that an insured, in order to qualify for coverage, need only incur a loss of property held by it, as a result of employee dishonesty. The record adequately demonstrates that [the insured] satisfied these terms and is thereby entitled to coverage. The evidence suggests that [the insured] held funds for [its principal]. These funds were then embezzled by two [of the insured's] employees. [The insured], as a result of the embezzlement had to reimburse [the principal]. . . The trial court therefore did not err in concluding that [the insured] suffered a compensable loss under the terms of the policy.

*Id.*

National Union's efforts to distinguish this case based on the fact that the misappropriated funds were insurance premiums, rather than settlement funds, are unpersuasive. The point is that the court found coverage, broadly interpreting the phrase "held by the Insured in any capacity" to include the dishonest acts of the agent.

Moreover, even assuming *arguendo* that NJ Title did not own or hold the funds at issue, its claim is covered under the Bond because it was "legally liable" for the funds. The law is clear that under these circumstances NJ Title's claim is covered.

In this regard, the case of *Nelson v. ITT Hartford Fire Ins. Co.*, 216 F.3d 1088 (10th Cir. 2000), is instructive. There, Nelson, the bankruptcy trustee for the estate of National Guaranty Title Insurance appealed from summary judgment granted in favor of ITT Hartford Insurance Company. *Id.* at *1089. For two years before National Guaranty went into bankruptcy, certain

employees misappropriated funds from escrow accounts, failed to pay out proceeds of loan closings and fraudulently collected funds to be used for insurance premiums knowing that National Guaranty was no longer authorized to issue title insurance policies. *Id.* After National Guaranty filed for bankruptcy, former clients and intended beneficiaries of the escrow monies, the defrauded title insurance company and others filed claims against the estate of National Guaranty. *Id.* The Trustee thereafter filed an adversary complaint against ITT Hartford to recover the escrow losses under its insurance policy to satisfy the claims against the estate. *Id.*

The fidelity bond covered compensatory damages arising directly from a loss covered by the bond, and it defined interests covered as property "[t]hat you own or hold"; or [f]or which you are legally liable." Under these facts, the court found that the Insured was legally liable, and thus there was coverage under the policy. *Id.*

The circumstances presented by New Jersey Title are essentially the same, with the exception that it was NJ Title's agent, and not an employee of NJ Title, that misappropriated the funds. However, as explained earlier, this distinction is immaterial because Rider No. 6 extends coverage to the dishonest acts of NJ Title's agent(s).

### B. Exclusion (f)(iii)

Exclusion (f)(iii) of the policy precluding coverage for losses resulting from contractual or extra-contractual liability sustained "in connection with the issuance of contracts or purported contracts of insurance, indemnity or suretyship" has no applicability.

The exclusion provides:

> This bond does not cover: loss resulting directly or indirectly from . . . (iii) contractual or extra-contractual liability sustained by the insured in connection with the issuance of contracts of insurance, indemnity or suretyship.

13

(Bond, Section 2, Exclusion (f)(iii)). NJ Title's loss was not based on any type of "contractual or extra-contractual liability," and further, was not "in connection with the issuance of contracts of insurance, indemnity or suretyship."

Decisions concerning whether an exclusion applies or whether there is insurance coverage based upon certain facts, are generally not proper issues to be determined on a motion to dismiss because they involve issues of fact. *See, U.S. Specialty Ins. Co. v. AT&T Corp.*, 2010 WL 3430527, *3 (D.N.J. Aug. 27, 2010), attached as Ex. G to Catenacci Dec..

Further, it is well-established in New Jersey jurisprudence that exclusions in insurance policies must be narrowly construed. *Flomerfelt v. Cardiello*, 202 N.J. 432, 442 (2010). Importantly, the burden is on the insurer to demonstrate that the claim plainly and clearly falls within the exclusion. *Id.* Thus, exclusions are strictly construed against the insurer and if there is more than one plausible interpretation, courts apply the interpretation that supports coverage. *Id. See also Aetna Ins. Co. v. Weiss*, 174 N.J. Super. 292, 296 (App. Div.), *cert. denied*, 85 N.J. 127 (1980).

Here, Defendant's attempt to rely upon an exclusion to argue that the complaint fails to state a claim is disingenuous and down right ridiculous. An insured bears the burden of alleging coverage under an insurance policy. It is implicit in an allegation that a claim is covered that it is not excluded. An insured has no burden and need not allege that a specific exclusion does not apply. Reliance upon an exclusion is a defense which the insurer must allege and upon which it has the burden of proof. Furthermore, the applicability of an exclusion is not an issue to be decided on a motion to dismiss for failure to state a claim because, *inter alia*, fact issues exist.

Finally, Defendant completely misrepresents (or misunderstands) the basis of NJ Title's insurance claim. NJ Title did not have to make payments for the misappropriation of the funds based upon any title insurance policy. There was no defect in title, which the title insurance

policy covered. Similarly, payment was not made based upon any "issuance" of title insurance. NJ Title was liable for the misappropriation of funds because its agent stole those funds.

### C. There is Coverage for an Agent's Infidelity, Where That Agent is Specifically Named as an Agent of NJ Title.

Contrary to Defendant's contentions, the bond does include agents named by the insured. (See Ex. 3 to Mills Dec., Rider 6). Significantly, NJ Title specifically named Landserv as an agent for the fidelity bond. (*See id.* and Ex. A to Catenacci Dec. at p. 9). Thus, National Union's contention that agents are not insureds under the bond and utterly ignores the relevant fact that the bond is a first-party policy that covers NJ Title for the infidelity of named agents. As such, the fidelity bond covers the dishonest and fraudulent acts of Landserv.

Further, contrary to the arguments made by National Union, the policy was not purchased to obtain coverage for misappropriated premiums. The policy at issue contains a $50,000 deductible. (*See* Ex. 3 to Mills Dec.). NJ Title receives very small amounts from its agent for premiums. (an average of $201.02 per file) It would take between 2 and 7 years for any agent's total remittances in premiums to ever reach the deductible amount and the bond at issue only covers a one-year period. As such, defendant's allegation that the purpose of the bond is to cover theft of premiums would make the coverage illusory.

NJ Title paid National Union $33,960 in premium for this bond. (*Id.*). NJ Title could not ever have a claim approaching the deductible amount ($50,000) for theft of premiums by an agent and would if National Union's interpretation of the policy were correct, be paying a premium of $33,960 for a policy that insured nothing.

## **CONCLUSION**

For the foregoing reasons, New Jersey Title Insurance Company respectfully requests that this Court deny National Union's motion to dismiss it in its entirety.

                              PODVEY, MEANOR, CATENACCI, HILDNER
                              COCOZIELLO & CHATTMAN, P.C.
                              Attorneys for Plaintiff, New Jersey Title Insurance Company

                              By: _____
                                  Henry J. Catenacci, Esq.

Date: July 5, 2011

#292430