NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY TITLE INSURANCE COMPANY, | **Hon. Dennis M. Cavanaugh** |
| Plaintiff, | **OPINION** |
| v. | Civil Action No. 11-CV-0630 (DMC)(JAD) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH and BROWN & BROWN OF CONNECTICUT, INC. d/b/a DILL, JOYCE & THRESHER INSURANCE, | |
| Defendants. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("Defendant" or "National Union") to dismiss Plaintiff New Jersey Title Insurance Company's ("Plaintiff" or "NJTIC") Complaint in this action as against National Union, or in the alternative, to dismiss Count Two of the Complaint alleging "breach of the implied covenant of good faith and fair dealing\bad faith," pursuant to FED. R. CIV. P. 12(b)(6). Pursuant to FED. R. CIV. P. 78, no oral argument was heard. After considering the submissions of the parties, it is the decision of this Court for the reasons herein expressed that Defendant's motion to dismiss is **granted**.

I. **BACKGROUND**[1]

Plaintiff New Jersey Title Insurance Company ("NJTIC" or "Plaintiff") is a title insurance company organized under the State of New Jersey. (Pl.'s Compl. ¶¶ 1, 6). NJTIC is in the business of underwriting title insurance policies in New Jersey and engages agents to settle and close title for real estate closings. (Pl.'s Compl. ¶¶ 1, 7; Pl. Br. Opp'n Mot. Dismiss)

On May 22, 2008, NJTIC entered into an "Agency Agreement" (the "Agreement") with Landserv Title, LLC ("Landserv"). (Pl.'s Compl. ¶ 18; Mills Decl., April 25, 2011, Ex. 2 p. 1, ECF No. 10-2). The Agreement established Landserv as NJTIC's "representative, or agent, to originate and solicit applications for title insurance, to examine and issue commitments to insure, and to issue and countersign Policies of Title Insurance and to close title (hold settlement) pursuant thereto...in the State of New Jersey."

The Agreement provided that Landserv was to collect, or see to the collection of, all fees for Commitments to Insure and Policies from the responsible parties. The language of the Agreement specifically limited the authority of Landserv to receive and hold funds on the account of NJTIC. Under its terms, Landserv was prohibited to "receive, or receipt for any funds, including escrow, or closing funds, in the name of Insurer," and was rather directed to "receive and receipt for same for its own account." However, Landserv was authorized to hold premium and reinsurance fees for NJTIC, which were to become the property of NJTIC immediately upon receipt of a collection.

---

[1] The facts set-forth in this Opinion are taken from the Parties' statements in their respective moving papers. A discussion of the relevant documents that govern the relationships of the parties is also necessary as the documents are integral and explicitly relied upon in Plaintiff's Complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

All other money entrusted to Landserv by NJTIC or others in the course of Landserv's operation under the Agreement was required to be kept segregated in a bank account by Landserv. See Mills Decl., April 25, 2011Ex. 2, Sect. 2.F., ECF No. 10-2 (directing Landserv to "[k]eep safely and separated in a bank trust account all money entrusted to Agent by Insurer or others in the course of Agent's operation under this agreement, and keep safely any property entrusted to Agent."). Upon settlement, the agent was directed to disburse funds from said trusts to pay off prior mortgages, taxes, water bills, and other municipal charges on the property for which insurance has been issued.

The Agreement addresses the issue of insurance coverage on the part of the insurer and its agents. The Agreement provided that Landserv was to maintain Errors and Omissions (E&O) and Employee Fidelity Insurance Coverage, with a minimum liability on each of $500,000. Paragraph 16 of the Agreement entitled "Insurer's Liability," provides that "[i]nsurer shall be liable for all other losses, damage, expense, and cost arising out of claims covered by, and based upon, any title insurance forms issued, and services rendered, under the terms of this Agreement, excepting only those losses, damage, expense and cost caused by actions, or omissions, for which Agent is responsible in the Agreement."

Defendant National Union is a corporation organized under the laws of Pennsylvania and is in the business of issuing policies of insurance coverage. (Pl. Compl. ¶¶ 2, 12). Effective July 1, 2009, National Union issued a Financial Institution Bond to provide insurance coverage to

NJTIC through insurance broker DJT, Insurance.[2] (Mills Decl., April 25, 2011, Ex. 3, Item 5, ECF No.10-2).

The Financial Institution Bond issued by National Union for NJTIC provided coverage from July 1, 2009 to July 1, 2010, and provided an Aggregate Liability for the underwriter in an amount of $1,000,000.00.[3]  The Bond further provided that the liability of the Underwriter was subject to the terms of Riders number one to ten attached thereto.  The provisions of the Bond that are of particular importance to the alleged coverage at issue here are Rider 6, Section 10, and Exclusion f(iii).

Rider 6 to the Bond, entitled "Agents Fidelity," specifically addresses the issue of coverage for NJTIC's agents.  Rider 6 provides coverage for "loss resulting directly from dishonest or fraudulent acts committed by an Agent named or described below," thereby limiting coverage to only those Agents identified in the Rider, and then only for the amount applicable to that Agent.  The Agents identified were "all agents provided with the renewal bind order received from ARC Excess 06/24/2009, inclusive of parts 1, 2, 3, and 4."

The coverage of Agent's Fidelity provision is subject to all other terms and exclusions of the Bond.  Section 10 of the Bond (the "Ownership Clause")  provided that the Bond shall not apply to the loss of "Property (1) owned by the Insured, (2) held by the Insured in any capacity,

---

[2]DJT Ins. is also a Defendant listed in the present action.  DJT Ins. is a corporation organized and existing under the laws of the State of Connecticut, with its principle place of business outside of New Jersey.  Plaintiff engaged DJT Ins. to obtain and place insurance coverage for it.  Pursuant to the directives given by NJTIC, DJT Ins. obtained insurance coverage for NJTIC under a Financial Institution Bond issued by Defendant, National Union.  Plaintiff's claims against DJT Ins. are not presently before this court.

[3]NJTIC requested, and DJT Ins. agreed to obtain, an insurance policy covering an agent's dishonesty and theft.

or (3) for which the Insured is legally liable." Exclusion (f)(iii) specifically identifies losses that are excluded from the coverage of the Bond, and specifies any loss resulting directly or indirectly from "contractual or extra contractual liability sustained by the Insured in connection with the issuance of contracts or purported contracts of insurance, indemnity, or suretyship."

In November of 2009, NJTIC discovered that an employee and/or principal of Landserv had misappropriated funds from Landserv's account for her own personal use.[4] (Pl.'s Compl. ¶ 21). As a result of the misappropriation, Landserv was unable to make the requisite payments to clear title for properties for which NJTIC had issued title insurance. Although Plaintiff fails to allege the specific circumstances for which it made the subsequent payments as a consequence of the misappropriation, it appears as though NJTIC issued payments to those third party claimants in order to satisfy the obligations that Landserv was no longer able to fulfill. NJTIC subsequently filed a claim with National Union for coverage for the loss associated with the misappropriation by Landserv. (Pl.'s Compl. ¶22). The claim stated "our agent Landserv Title, LLC . . . misappropriated funds from its trust account which will have to be made up by New Jersey Title. Agent also misappropriated premiums due to New Jersey Title." (Mills Decl., April 25, 2011, Ex. 1, ECF No. 10-2). Plaintiff attached to the Claim a document entitled "Landserv Title & Abstract, Trust Fund Analysis" for a specific trust account as evidence of the misappropriations. Plaintiff estimated the total amount of diverted trust funds to be $616,894.79.

---

[4]Upon receipt of notification of a check issued by Landserv to pay off a mortgage held on residential property at a recent closing was returned due to insufficient funds, NJTIC conducted an audit of Landserv's office and records. Pursuant to the audit, NJTIC learned that Landserv's employee had misappropriated funds from Landserv accounts from December 2007 to November 2009.

National Union denied coverage for NJTIC's claim by letter dated September 23, 2010. (Mills Decl. Ex. 4, ECF No. 10-2).  As grounds for the denial of coverage, National Union explained that the loss sustained by NJTIC did not fall within the coverage of the Bond, that the claimed losses arose from contractual liabilities excluded from coverage by Exclusion (f) of the Bond, and that the coverage provided by the Bond was only excess over any valid and collectible insurance obtained, and NJTIC had not established that any primary insurance coverage had been exhausted.

Plaintiff brought the present action on February 3, 2011, raising claims of breach of contract and breach of the implied covenant of good faith and fair dealing/bad faith against National Union for its purported improper denial of NJTIC's claim.  Defendant National Union now moves to dismiss all of Plaintiff's claims against it, or in the alternative, to dismiss Count Two of Plaintiff's Complaint, which alleges a breach of the implied duty of good faith and fair dealing/bad faith.

For the following reasons, this court  finds that Plaintiff has not alleged a loss that falls within the insurance coverage provided by Defendant National Union.  Plaintiff has therefore failed to state a claim upon which relief can be granted and Defendant's Motion to Dismiss the Complaint as against National Union  is **granted.**

## II.    MOTION TO DISMISS

### A.    LEGAL STANDARD

In deciding a motion under Rule 12(b)(6), the district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the  [Plaintiff]."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir.

2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, assuming that the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above a speculative level." Bell Atl. Corp. 550 U.S. at 555.

"A complaint will survive a motion to dismiss if it contains sufficient factual matter to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the Defendant is liable for misconduct alleged." Id. "Determining whether the allegations in a complaint are 'plausible' is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Young v. Speziale, 2009 WL 3806296, *3 (D.N.J. Nov. 10, 2009) (quoting Iqbal, 129 S.Ct. at 1950). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown'–that the pleader is entitled to relief." Iqbal, 129 S.Ct. at 1950.

The district court may consider "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004). If a document is "'integral to or explicitly relied upon in the complaint'" it forms the basis of a claim. Id. citing In re Burlington Coat

Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997). "The purpose of this rule is to avoid the situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document." Id. By relying on the document to form the basis of a claim, "the plaintiff is on notice that the document will be considered." Id. "When allegations contained in a complaint are contradicted by the document it cites, the document controls." In re PDI Sec. Litig., No. 02-CV-0211, 2005 WL 2009892, *21 (D.N.J. Aug. 17, 2005).

    B.    DISCUSSION

Defendant alleges that Plaintiff's Complaint as it pertains to Defendant National Union should be dismissed for failure to state a cause of action upon which relief can be granted. In the alternative, Defendant asks this Court to dismiss Count Two of the Complaint, which alleges a breach of the implied covenant of good faith and fair dealing/bad faith. (Def. Br. Supp. Mot. Dismiss, April 25, 2011, ECF No. 10-1). For the reasons herein discussed, this Court finds that Plaintiff has failed to sufficiently allege facts to bring their claim within the coverage of the Bond. As both of Plaintiff's claims against National Union are predicated on NJTIC's claim falling within the coverage of the Bond, Plaintiff's claims against National Union must therefore be dismissed.

    1.    **Breach of Fidelity Bond**

Plaintiff's claims of breach of contract and bad faith are premised upon National Union's denial of coverage under an insurance agreement. Plaintiff bears the burden of bringing its claims within the basic terms of the insurance policy. Columbus Farmers Mkt, LLC v. Farm Family Cas. Ins. Co., No. 05-2087, 2006 U.S. Dist. LEXIS 92448, *23-24 (D.N.J. Dec. 21,

2006), citing <u>Sears Roebuck & Co. v. Nat'l Union Fire Ins. Co.,</u> 340 N.J. Super. 223, 234 (App. Div. 2001).  As Plaintiff's claims require an interpretation of the Financial Institution Bond issued by Defendant National Union in conjunction with the Agency Agreement between NJTIC and Landserv, which establishes the scope of authority for the Agent who occasioned the misappropriation, resolution of this motion to dismiss necessitates an interpretation of the relevant instruments.  See <u>In re Burlington Coat Factory Sec. Litig.,</u> 114 F.3d at 1425-26; <u>see also</u> <u>Winer Family Trust v. Queen,</u> 503 F.3d 319, 328 (3d Cir. 2007); <u>Mele v. Fed. Reserve Bank of New York,</u> 359 F.3d 251, 256 n. 5 (3d Cir. 2004).

As previously discussed, the provisions relevant to whether Plaintiff's claim falls within the coverage of the Policy are the Ownership Clause, Rider 6 entitled "Agent Fidelity," and Exclusion (f)(iii).  These provisions must be interpreted in light of the limited nature of Landserv's agency as laid out in the Agency Agreement.

Section 10 of the Bond provides limited coverage, directing that the Bond shall apply to loss of "Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable."  Accordingly, in order for Plaintiff's loss to fall within the coverage of the Bond, the misappropriated funds must fall into one of the enumerated categories.  As this Court finds that the Plaintiff has failed to allege facts to demonstrate that the misappropriation falls within any of the enumerated categories, Section 10 of the Bond does not afford coverage for the alleged loss.

First, the misappropriated funds were not "owned" by NJTIC, as the Agency Agreement specifically provided that Landserv was to receive the funds for its own account, with only the premiums and reinsurance fees to become the property of NJTIC.  Such premiums were

instructed to be kept in a segregated account from all other money received by Landserv.  While NJTIC alleged loss of premiums due to it in its claim to National Union, it has only alleged misappropriation from a single account held by Landserv, and has not alleged that such account was that specifically designated for collection of NJTIC's premiums and reinsurance fees.  Plaintiff rather alleges that the loss was occasioned not by the misappropriation itself, but the subsequent payments made by NJTIC as a result.   Therefore, it cannot be alleged that the loss was occasioned through left of funds that were owned by NJTIC.

Similarly, the funds were not "held" by NJTIC, as the Agency Agreement again specifically limited the extent to which Landserv could receive funds on the account of NJTIC.  While the Bond does provide broad language in its inclusion of any property "held by the Insured in any capacity," NJTIC clearly delineated the nature of property that its agents could hold on its behalf.  Notably, the Agreement specifically precluded Landserv from receiving funds on the account of NJTIC beyond premiums and reinsurance funds, and we again note that the loss is alleged to have resulted from subsequent payments made by NJTIC and not theft from the segregated account.  The "in any capacity" language of the Ownership Clause is inconsequential as the Agency Agreement precluded Landserv's ability to "hold" such funds on behalf of NJTIC.  Such funds could not be held by NJTIC in the capacity of its agents, and were therefore not held for NJTIC by Landserv.[5]

---

[5]Plaintiff relies on several cases to interpret the "in any capacity" language provided in the Ownership Clause.  The cases relied upon by Plaintiff, however, are distinguishable as each case addressed misappropriations occasioned by employees of the insured who were not specifically excluded from the insurance coverage provided the employer.  Plaintiff attempts to avoid this distinction by alleging that Landserv was specifically provided for in the coverage of the Bond, yet has failed to allege sufficient facts to substantiate this assertion.  Plaintiff's attempt to employ the analysis from these cases is therefore unavailing.

Finally, NJTIC has not alleged sufficient facts to demonstrate a plausibility that it was legally liable for the funds that were misappropriated. NJTIC alleges that the misappropriation was of funds which NJTIC was required to pay, but does not provide further factual support to demonstrate why this is so. The only support that Plaintiff provides regarding its assertion of liability is an interpretation of the term "legally liable" derived from a Tenth Circuit case involving completely different circumstances. Plaintiff relies on the case of <u>Nelson v. ITT Hartford Fire Ins. Co.</u>, in which a Trustee in Bankruptcy was able to recover for the misappropriation by employees of the insured. 2000 U.S. App. LEXIS 13919, *8, n.2 (10th Cir. June 13, 2000). There, the language of the agreement established that the insurance policy was one for indemnity from liability, not merely from loss. <u>Id.</u> Notably, the court held that the accrual of liability was controlled by the intent of the parties as expressed by the language of the policy. <u>Id.</u> There, the court found that the use of the term "liability" established that an action to enforce indemnity from liability would accrue when the event to which indemnity is due occurs. <u>Id.</u> Here, Plaintiff has failed to point to any language in the Agreement representing an intent on the part of the parties to indemnify a misappropriation such as the one occasioned in the present dispute. In fact, the language of the agreement is to the contrary, specifically disavowing ownership of any funds other than the designated premiums and reinsurance fees and specifically limiting coverage to those agents that were named.

Rider 6 of the Bond similarly does not provide coverage for the infidelity of NJTIC's agents. Plaintiff argues that the policy clearly provides coverage for the theft by an insured's agent, including Landserv, which it maintains was directly and explicitly identified as an agent under the policy. In support of this assertion, Plaintiff points to an untitled list containing

11

Landserv's name and identifies this document as "the agent list NJ Title provided to the Defendant in June 2009 with reference to Bond No. 02-283-42-48, which clearly identifies Landserv Title Agency, LLC . . . as an agent of NJ Title." (Catenacci Decl. ¶ 2).

The relevant question, however, is not whether Landserv is an agent of NJTIC, but rather whether Landserv is among those agents specifically designated for insurance coverage under the Bond. The terms of the Bond clearly indicate that merely being an agent of NJTIC is not sufficient to fall within the insurance coverage provided.

Rider 6 provides coverage for "loss resulting directly from dishonest or fraudulent acts committed by an Agent named or described below," and then only for the amount up to the Single Loss Limit of Liability applicable to that Agent." Under the heading "Agent," the Rider provides "Single Loss Limit of Liability of $1,000,000 applicable to [all agents provided with the renewal bind order received from ARC Excess on 6/24/2009, inclusive of parts 1, 2, 3, and 4]." Plaintiff has failed to produce the referenced documentation to demonstrate that it is among the agents so named, and has therefore failed to allege sufficient facts to demonstrate entitlement to relief. Such failure to adequately allege coverage under the Bond is fatal to both Plaintiff's breach of contract claim as well as the claim of bad faith. Accordingly, Plaintiff's Complaint as against National Union must be dismissed.

Because this Court finds that Plaintiff has failed to sufficiently allege coverage under the insurance policy at issue, we do not reach the issue of whether Plaintiff's claim falls within the exclusion provided in subsection (f)(iii). We do note, however, that to the extent Plaintiff relies on its position as title insurer as a basis for its claim of legal liability, such liability is expressly precluded from coverage under Exclusion (f)(iii). Exclusion (f)(iii) of the Bond excludes from

coverage losses resulting directly or indirectly from "contractual or extra-contractual liability sustained by the insured in connection with the issuance of contracts of insurance, indemnity or suretyship." Plaintiff can therefore not rely on their obligation to clear title to the property it insured as a basis for a loss within the coverage of the policy.

Similarly, because we find that Plaintiff has failed to allege sufficient facts to fall within the coverage of the Bond, we do not address Section 9 of the Bond which provides that "coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the insured." We do note, however, that Plaintiff has failed to allege exhaustion of the insurance that Plaintiff required Landserv to acquire as a condition of the Agency Agreement.

Upon consideration of the relevant documents, the limiting language of both the Agency Agreement and the Bond instruct that Plaintiff has failed to allege sufficient facts to support a claim of coverage under the Bond. There are no facts that Plaintiff can allege to bring its claim under the coverage of the policy when the policy by its terms specifically precludes coverage. Accordingly, Plaintiff has failed to state a claim for relief against National Union that is plausible on its face and Plaintiff's claims must be dismissed.

    2. **Bad Faith**

While we note that Plaintiff's failure to allege sufficient facts to bring its claim within the coverage of the Bond's effectively precludes any claim of bad faith denial of coverage, we briefly discuss the standard for bad faith in further support of our dismissal of Plaintiff's Complaint as against National Union.

In order to state a claim for bad faith denial of insurance coverage, Plaintiff must show: (1) the insurer lacked a reasonable basis for its denying benefits, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim. Pickett v. Lloyd's, 131 N.J. 457 (1993). Under New Jersey precedent, a denial of an insurance claim that is "fairly debatable" will not be found to constitute bad faith. Id. The "fairly debatable" standard will be met if the claimant could have established as a matter of law a right to summary judgment on the substantive claim. Id. at 473. Therefore, as a matter of law, a claim of bad faith must fail if there is an issue of material fact as to the underlying claim regarding Plaintiff's entitlement to insurance benefits. See Tarsio v. Provident Ins. Co., 108 F. Supp. 2d 397, 401 (D.N.J. 2000).

When the insured's complaint contains issues of material fact as to the underlying claim, dismissal of a related bad faith claim is proper. Fuscarello v. Combined Ins. Group, Ltd., 2011 WL 4549152, at *5 (D.N.J. Sept. 29, 2011) (dismissing Plaintiff's bad faith claim on a motion to dismiss where insurer's reason for refusing to pay, as alleged in the complaint, presented disputed issues of material fact as to the underlying substantive claim); Dare Inv., LLC v. Chicago Title Ins. Co., 2011 WL 2600594, at *12 (D.N.J. June 29, 2011) (dismissing Plaintiff's bad faith claim because Plaintiff could not prevail on summary judgment for the underlying insurance claim due to the ambiguity of the title policy at issue and the Plaintiff's reasonable expectations thereunder). Here, Defendant's denial of coverage, as evidenced in the denial letter dated September 23, 2009, provided an extensive explanation as to why Plaintiff's claim did not fall within the coverage of the Bond. Such explanation provides plausible reasons for the denial of coverage and demonstrate that there is, at the very least, genuine questions regarding whether Plaintiff's claims fall within the coverage

provided. Plaintiff's claims made under the Bond are therefore fairly debatable and cannot form the basis of a bad faith claim.

Moreover, Plaintiff's claims that Defendant has issued coverage in previous similar instances under policies containing similar language is not sufficient to sustain a claim for bad faith. Mere payment of previous similar claims does not demonstrate bad faith on the part of the insurer for subsequent denials of similar claims. See Keystone Filler & MFG. Co., Inc. V. Am. Mining Ins. Co., 179 F.Supp.2d. 432, 443-444 (E.D.Pa. 2002); (holding mere payment of a previous claim should not, without more, bind an insurer to an interpretation under which the insured is covered for all similar claims); Charter Oil Co. v. Am. Emp'r Ins. Co., 69 F.3d 1160, 1168 (D.C. Cir. 1995) (noting that "[a] contrary holding would require that the insurer, before paying modest claims such as the initial claims . . . here, conduct an investigation in far greater depth than the amount at stake would justify, simply to avoid the risk of massive exposure down the road."). Plaintiff can therefore not establish a plausible claim of bad faith merely upon allegations that Defendant has issued coverage over similar claims in the past.

Accordingly, Plaintiff's claims of bad faith on the part of Defendant due to the denial of coverage for the alleged loss must be dismissed.

IV. **CONCLUSION**

Plaintiff has therefore not alleged sufficient facts to bring the purported loss within the coverage of the Bond. Defendant's motion to dismiss for failure to state a claim upon which relief may be granted is therefore **granted**.

      S/ Dennis M. Cavanaugh  
      DENNIS M. CAVANAUGH, U.S.D.J.

Date: December 27, 2011  
cc: All Counsel of Record  
      Hon. J. A. Dickson, U.S.M.J.  
      File